UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA



UNITED STATES OF AMERICA,

    Plaintiff,

-vs-                                CASE NO. 00-6205-CR-HUCK

STEVEN MELTON KIVETT,

    Defendant.
_____/

## DEFENDANT KIVETT'S MOTION TO SUPPRESS STATEMENTS

COMES NOW defendant STEVEN KIVETT, by and through undersigned counsel and pursuant to The Fifth Amendment right against self-incrimination, The Sixth Amendment right to counsel, the Due Process Clause of the United States Constitution and Federal Rule of Criminal Procedure 12(b)(3), and moves this Honorable Court to suppress his statements to law enforcement personnel Timothy Maleport (U.S.C.G.), C.O. Lee (U.S.C.G.), Andres Correa, Jr. (I.N.S.), and Francisco Meneses (I.N.S.).

## FACTS

During the discovery process, the defendant has become aware of statements allegedly made by the defendant to representatives of both the United States Coast Guard and the I.N.S. Border Patrol. According to the reports



provided to the defendant, the defendant made various statements to U.S. Coast Guard officials, after the Coast Guard officials had stopped and boarded the boat that the defendant was captaining. When the Coast Guard officials finally read the defendant his *Miranda* rights, the defendant stated that he did not wish to make a statement without an attorney present. The Coast Guard officials did not formally question the defendant but remained on his boat with him and, with the defendant's assistance, sailed the boat to a dock in Fort Lauderdale; the Coast Guard officials continued their discussions with the defendant, and the defendant made more statements that the government now apparently wants to introduce into evidence at the defendant's trial.

At some point after the defendant had invoked his right to counsel, the I.N.S. Border Patrol questioned the defendant. When the Border Agents read the *Miranda* warnings to the defendant, he again invoked his right to counsel. Prior to the *Miranda* warnings and the re-invocation of right to counsel, the defendant made statements to the Border Control agents that the government now apparently wants to introduce into evidence at the defendant's trial.

## MEMORANDUM OF LAW

The Fifth Amendment privilege against self-incrimination provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." Police interrogation of a suspect in custody threatens the exercise of this Fifth Amendment privilege because of the danger that officers might actively compel

confessions through overtly coercive interrogation, or passively compel them be exposing suspects to the "inherently coercive" environment created by custodial interrogation. *New York v. Quarles*, 467 U.S. 649, 654 (1984). In *Miranda v. Arizona*, 384 U.S. 436 (1966), The Supreme Court established a prophylactic, procedural mechanism that safeguards a defendant's Fifth Amendment privilege against the inherently coercive nature of custodial interrogation. In the recent case of *Dickerson v. United States*, ___ U.S. ___, 120 S.Ct. 2326 (2000) the Supreme Court re-affirmed the *Miranda* principles and confirmed that the *Miranda* decision was constitutionally based.

In the instant case, the defendant was "in custody" for purposes of *Miranda* analysis. Although a routine Coast Guard stop and boarding does not amount to custody for *Miranda* purposes, *see United States v. Rioseco*, 845 F.2d 299 (11th Cir. 1988), this stop and boarding went beyond the routine, as can be seen by an examination of the Coast Guard Report written by Timothy Maleport.[1] Maleport continued his questioning and interrogation of the defendant without reading the defendant his *Miranda* warnings, even after his suspicions that the defendant was involved in criminal activities had been aroused, and the scope of the questioning went far beyond that allowed by the "routine Coast Guard stop and boarding" doctrine.

Even if this Court determines that *United States v. Rioseco* allowed the Coast Guard questioning of the defendant prior the reading of *Miranda* warnings,

any statements that the defendant made in response to questioning after he invoked his right to counsel must be suppressed. Once a defendant invokes his Sixth Amendment right to counsel in connection with a particular case, the police may no longer question him. *Michigan v. Jackson*, 475 U.S. 625 (1986); *Fleming v. Kemp*, 837 F.2d 940 (11th Cir. 1988). This rule is similar to the rule announced in *Edwards v. Arizona*, 451 U.S. 477 (1981), which bars any police initiated questioning after the suspect has invoked his right to counsel under the Fifth Amendment (i.e. *Miranda*). *Bassett v. Singletary*, 105 F.3d 1385 (11th Cir. 1997). In the instant case, all of the law enforcement questioning that occurred after the defendant had invoked his right to counsel clearly violated these precepts of law.

## CONCLUSION

For the foregoing reasons, defendant STEVEN KIVETT requests that this Honorable Court conduct a suppression hearing on the issues raised in this motion and issue an order excluding the defendant's statements from evidence at trial in the instant case.

## LOCAL RULE 88.9 CERTIFICATE

---

[1]: A copy of this report is attached to the instant motion.

I HEREBY CERTIFY that I have attempted to contact Jeffrey N. Kaplan, Esq., the AUSA prosecuting this case, and have been unable to obtain his position with regard to the foregoing motion.

Respectfully Submitted,

CLAYTON R. KAEISER, ESQ.
Attorney for Defendant Kivett
28 West Flagler Street
Suite 301
Miami, Florida 33130
(305) 371-4989
(305) 371-4986 (facsimile)

### CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing Motion was hand-delivered to AUSA Jeffrey N. Kaplan, 500 East Broward Blvd., Suite 700, Fort Lauderdale, Florida 33301, on this 28th day of August, MM.

BY: _____
CLAYTON R. KAEISER
Florida Bar No. 348120

I Timothy A. Maleport, Chief Machinery Technician, USCGC MAUI (WPB 1304) do make the following statement concerning the boarding and subsequent seizure of the Sailing Vessel Pixie on 16 July 2000.

At approximately 0900 the Sailing Vessel Pixie, Official number OH1548YB was spotted in the Straits of Florida at approx position LAT: 26 16 90, LONG: 078 58 86. USCGC MAUI conducted the rights of passage questions. This determined the vessel to be a US Flagged vessel with a US Master and 9 additional persons onboard for a total of 10. During these questions, the master stated that the other persons onboard were Bahamian. The determination was made to board the vessel with the boarding team consisting of myself as boarding officer, LTJG Christopher Lee as assistant boarding officer and BM1 Manny Zambrana and MK2 Dave Brooker as boarding team members.

At approximately 0940 BM1 Manny Zambrana and myself boarded the vessel while underway. I explained to the Master, Steven Melton Kivett why were coming onboard, and that 10 people on a 27 foot sailboat seemed a large number. He assured me that he had sufficient life preservers onboard and that he had all the required safety equipment. While inspecting the vessel's documentation the master informed us that he had just purchased the vessel for $6000.00 from Seven Sea's Brokers. He produced a bill of sale and the registration for the previous owner's which was still current and valid. I asked the master of the vessel the normal questions such as his last port of call, next port of call and purpose of voyage etc. He informed me that he had left Freeport, Bahama's the night of the 15th of July 2000 at 2230. He was taking his passengers to Lighthouse Point, FL. He informed me that the purpose of the trip was to bring these people to the US for a shopping trip at a local Flea Market. He informed me that these 9 people had paid him $100.00 US each to take them from Freeport, Bahama's to the United States for the purpose of shopping at a Flea Market and to visit relatives. Some of the persons were to spend the day shopping and then return to the Bahama's with him for an additional $100.00 US. each. Others would stay with their relatives in the US and fly back to the Bahama's at a later date. I asked him what nationality his passengers were and he stated that they were all Bahamian and that they all had the necessary papers or identification to enter the US.

As I was speaking with the master I overheard some of the passengers speaking French. I asked the closest passenger to me where was he born, and he stated Haiti. I asked a

few others and they too stated that they were born in Haiti. The master of the vessel then looked at me and said "Aw man, they said they were Bahamian", but did not look surprised or look at any of the other people onboard. At this point I signaled for LTJG Christopher Lee who was in the MAUI's small boat along with MK2 Brooker and the boat crew to come onboard.

I asked the master how he came to have these people onboard and he stated that he was sitting in a bar at Dundee Bay Resort in the Bahama's. He had been talking to some of his friend's about coming to the US and a man approached him. He identified the man as Michael Joseph. Mr. Joseph made Mr. Kivett an offer of $100.00 per person for him to take them to the US. The master agreed and Mr. Joseph collected the money from the others persons and paid the master $900.00 US total.

While onboard we noticed that the vessel had an unusually large amount of Life Preservers for this size of vessel. There was more than 10 life preservers and a large amount of food and water. There was 2 one gallon empty water containers, one full gallon of water and numerous drinks such as juices and a large amount of fruits and snacks.

After determining that all passengers were in fact Haitian and not Bahamian, we transported the Haitian personnel to the MAUI's small boat for further transport to the MAUI. As the last person was transported to the MAUI, I returned and conferred with my Commanding Officer who informed me that we would escort the vessel to Fort Lauderdale.

At this point it was determined that we would transfer First Class Cadet Burns from the MAUI to the Pixie to help with the trip to Fort Lauderdale. Cadet Burns and myself would stay onboard the vessel for the escort back to Fort Lauderdale. The remaining boarding team was to return to the MAUI.

It was approximately 1015 by this time. At this point, Cadet Burns and myself went to the Pixie. I read the Master his Miranda Rights, informed him that he was suspected of the transportation of illegal aliens into the US and alien smuggling. I asked him if he understood the rights that I had read and had him sign acknowledging that he understood them. I also informed him that he was not under arrest at this time, but that we were detaining him and were going to escort the vessel to Fort Lauderdale. The master stated that he understood them and did not wish to make a

statement without a lawyer present. At this point we stopped any further questions.

Cadet Burns and myself stayed onboard until approximatelly 1845, 16 July 2000. Without prompting from either Cadet Burns or myself, the master asked us if he would be charged or prosecuted for having the people onboard and trying to bring them into the US, or if there was the possibility of his boat being seized. I informed him that there was a good possibility, but that it was not up to me. He then made a statement, "Oh well, I only paid $6000.00 for it". In addition to this he restated the other statements and stayed with the same story of taking them shopping for $100.00 each. He also stated that Michael Joseph spoke very good english and that is how they had communicated at the Dundee Bay Resort as well as on the boat. He stated that Michael Joseph had spent a couple of hours talking to him and that he even helped steer the boat for a while. Upon returning to the MAUI however, Michael Jospeh either could not or refused to speak in english, but did converse well with MAUI crewmembers for such things as use of the bathroom, requests for phone calls etc. in spanish.

He also made statements that he had a 52 foot sailboat previously, but that it was destroyed in a hurricane. He said that although the vessel was insured, but that the insurance company went bankrupt and that he had lost everything.

At 1845, LTJG Lee and MK3 William Dove relieved us as escort. I informed LTJG Lee that the master of the vessel had been read his Miranda rights and that he wished not to make any statement until he had a chance to confer with a lawyer. Cadet Burns and myself then returned to the MAUI. LTJG Lee and MK3 Dove stayed onboard the S/V Pixie until the vessel was docked at Fort Lauderdale. At approximately 0600 17 July 2000 the S/V Pixie/Station Fort Lauderdale came out and escorted the S/V Pixie to the dock.

Timothy A. Maleport, MKC, USCG

3

The following statement is made in regards to the boarding of Sailing Vessel Pixie, 16-17 Jul 00.

At approximately 1120 a.m. on 16 Jul 00 I boarded Sailing Vessel (S/V) Pixie as a member of USCGC MAUI, Maritime Law Enforcement Boarding Team. The vessel was underway approximately 20 nautical miles southwest of Freeport Harbor, Bahamas. The vessel was captained by Mr. Steven Jivett, who also stated that he owned the vessel. Although the vessel was not registered in Mr. Jivett's name, he did possess a bill of sale and stated that he still needed to finish documenting the vessel in his name. Mr. Jivett had nine other persons on board his vessel, 6 male and 3 female. Mr. Jivett stated that all nine persons on board his vessel were Bahamian. He further stated that one of the passengers, a Mr. Michael Joseph had approached him in Freeport and asked if he would give Mr. Joseph and eight of Mr. Joseph's friends transport to Florida. Mr. Jivett explained that the purpose of the Bahamian passengers visit was to go shopping and that some would stay in Florida and that some would return with him. Mr. Jivett stated that Mr. Michael Joseph offered and paid him one hundred U. S. dollars per person for the trip to Florida and had promised one hundred U. S. dollars for each person that Mr. Jivett would transport back to the Bahamas. Mr. Jivett stated that he departed Freeport, Bahamas at 2230, 15 Jul 00 and was declaring Lighthouse Point Marina, Florida as his intended next port of call.

Soon after arrival it was readily apparent that the passengers on board the S/V Pixie were not Bahamian. The passengers appeared to speak Haitian Creole to each other. When I asked on passenger if they were from the Bahamas, I got a reply in broken English, which was simply "Haiti". I then showed several passengers Mr. Jivett's U. S. Passport and pointed to it. I received an Identification Card from two of the passengers. One was a Haitian Identification Card, the other was a Haitian Voter Registration Card. Upon hearing the claim of Haiti for his passengers, Mr. Jivett stated that he did not know his passengers were Haitian and that Mr. Michael Joseph and a few of the other passengers spoke perfect English. Mr. Jivett stated that these few English speakers were the only ones he interacted with which was why he did not know that the rest of the passengers did not speak English. He stated that "They simply walked aboard and went below" and that he really didn't pay them any mind.

All nine Haitian migrants were removed from the S/V Pixie and placed on board USCGC MAUI. During the offload, the USCGC MAUI Boarding Team had to outfit all nine Haitian Migrants with life jackets. Mr. Jivett, who had sailed to Freeport alone, and claimed to be approached after his arrival in the Bahamas, offered up that he had 12 life vests on board if we needed them. He further stated that he had just gone out and bought some extra ones and that they might still be in the packages. Twelve life vests were located on board the S/V Pixie, some of which were still in fact in their packages. Several of the migrants also appeared to be suffering from sea sickness and possible dehydration. Mr. Jivett stated that he did not think that was possible as he had gone shopping at Publix prior to his trip to the Bahamas and picked up many spare gallon jugs of water, containers of juice, extra fruit, and snack food. Mr. Jivett further stated that he had woken up the passengers at 0600 that morning and made sure that they had water, juice, and some fruit and that this reason was why he was sure that they shouldn't be dehydrated.

The statement listed above is factual to the best of my knowledge.

*[signature]* C. Lfg, USLL

C. O. LEE, LTJG, USCG

4

The Miranda Warning given by SA MENESES and witnessed by this writer and LEE. Upon questioning by SA MENESES, KIVEET invoked his right to legal counsel. Prior to invoking his right to legal counsel KIVEET admitted to having received $900 U.S. Dollar, from Michael Joseph a national of Haiti (one of the nine passengers). KIVEET had visited on several occasions the Dundee's Bar in the Bahamas and had seen Michael Joseph selling conch to the customers. JOESPH approached KIVETT and offered to pay $100 U.S. Dollars for eight Bahamian friends and himself to be taken to the U.S. to shop at a local flea market and visit family. KIVEET then invoked his right to legal counsel and questioning by SA MENESES was immediately halted.

| NAME | DATE |
|---|---|
| Andres Correa Jr., Special Agent | July 19, 2000 |

G-166c (subs)